## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel* MELANIE DUHAINE, *Plaintiffs*, | ) ) ) | 3:19-CV-00963 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| APPLE HEALTH CARE INC., *Defendant*. | ) | AUGUST 10, 2022 |

### MEMORANDUM OF DECISION RE: MOTION TO DISMISS (ECF No. 45)

Kari A. Dooley, United States District Judge:

Plaintiff-Relator, Melanie Duhaine ("Plaintiff"), brings this action against Defendant, Apple Health Care Inc. ("Defendant"), on behalf of the United States of America ("Government") pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").[1] In her three-count Amended Complaint, Plaintiff alleges that Defendant: (1) knowingly presented, or caused to be presented, false claims to the Government for reimbursement of rehabilitation therapy services under the Medicare program in violation of 31 U.S.C. § 3729(a)(1)(A); (2) knowingly used, or caused to be used, false statements material to the payment of those false claims in violation of 31 U.S.C. § 3729(a)(1)(B); and (3) knowingly conspired with LWF Holdings, Inc. ("LWF Holdings"), Allstar Therapy, LLC ("Allstar Therapy") and Swallowing Diagnostics, LLC

---

[1] The FCA is an anti-fraud statute that "may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, 'in the name of the Government.'" *Kellogg Brown & Root Servs., Inc. v. U.S. ex rel. Carter*, 575 U.S. 650, 653 (2015) (quoting 31 U.S.C. § 3730(b)(1)); *see Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000) ("*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'"). "In a *qui tam* suit under the FCA, the relator files a complaint under seal and serves the [Government] with a copy of the complaint and a disclosure of all material evidence. § 3730(b)(2). After reviewing these materials, the [Government] may 'proceed with the action, in which case the action shall be conducted by the Government,' or it may 'notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.' § 3730(b)(4). Regardless of the option that the United States selects, it retains the right at any time to dismiss the action entirely, § 3730(c)(2)(A), or to settle the case, § 3730(c)(2)(B)." *Kellogg Brown & Root Servs.*, 575 U.S. at 653. On December 16, 2020, the Government declined to prosecute this action pursuant to § 3730(b)(4)(B). (ECF No. 12-1)

("Swallowing Diagnostics") to use false statements and present false claims to the Government in violation of 31 U.S.C. § 3729(a)(1)(C). Defendant moves to dismiss the Amended Complaint in its entirety for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or to plead fraud with particularity as required under Fed. R. Civ. P. 9(b).[2] For the reasons that follow, Defendant's motion to dismiss is GRANTED.

**Factual Allegations**

The Court accepts as true the allegations in Plaintiff's Amended Complaint, which are as follows. Defendant is a privately held corporation that owns and operates twenty-three skilled nursing facilities throughout Connecticut and Rhode Island.[3] (ECF No. 32 at ¶ 12) All of Defendant's facilities are managed by Defendant's corporate team, comprised of Defendant's Owner, Director of Operations, Director of Clinical Services, Director of Therapy Services, and Director of Human Resources. (*Id.*) Defendant's facilities sustain a total capacity of approximately two-thousand active skilled nursing beds. (*Id.*) At each facility, Defendant offers short-term, long-term, and post-acute rehabilitation care, as well as physical, occupational, and speech therapy services. (*Id.*)

Defendant does not employ any of the therapists who provide services at its facilities. (*Id.* at ¶ 96) Rather, Defendant contracts with Allstar Therapy to hire therapists for each of its facilities, and with Swallowing Diagnostics to provide swallowing services related to speech therapy. (*Id.*) Allstar Therapy is Swallowing Diagnostics' sole principal. LWF Holdings is Allstar Therapy's sole principal.[4] (*Id.* at ¶¶ 3, 97) All three entities share the same primary address as Defendant in

---

[2] Oral argument was held on June 14, 2022.
[3] Although Defendant is alleged to both own and operate these facilities, at oral argument it was clarified that Defendant manages the facilities but that each is separately owned.
[4] Plaintiff alleges that, in turn, LWF Holdings is also Swallowing Diagnostics' "de facto sole principal." (*Id.*)

Avon, Connecticut. (*Id.* ¶ 97) And Defendant's President, Brian J. Foley is married to LWF Holdings' President, Treasurer and Secretary, Lisa Wilson-Foley.[5] (*Id.* at ¶ 98)

From March 19, 2018 to July 20, 2018, Plaintiff was employed as the Director of Nursing at Defendant's skilled nursing rehabilitation facility in Old Saybrook, Connecticut ("Saybrook facility"). (*Id.* at ¶ 10) Plaintiff's responsibilities included managing and supervising the regulatory compliance process, providing consulting services on general nursing practices to staff and administrators, and acting as lead nurse.[6] (*Id.*)

In Count One of her Amended Complaint, Plaintiff claims that Defendant knowingly presented false claims to Medicare for unreasonable, unnecessary, or otherwise non-reimbursable rehabilitation therapy services. (*Id.* at ¶¶ 110–11) In support of her claim, Plaintiff alleges that Defendant's corporate team implemented an unwritten billing system to exploit Medicare reimbursement rates "from at least June 17, 2011, going forward."[7] (*Id.* at ¶¶ 1, 61, 86) Defendant's corporate team and facility-based leaders, such as each facility's Director of Therapy and Director of Minimum Data Sets ("MDS"), enforced Defendant's directive by pressuring providers responsible for patient intake to prescribe Medicare patients the most expensive therapy and assign them longer stays than necessary.[8] (*Id.* at ¶¶ 59, 85–86) Accordingly, therapists specializing in

---

[5] Plaintiff alleges that the Foleys are financially profiting from a conspiracy among their respective companies to submit false claims to the Government for medically unreasonable, unnecessary, or otherwise non-reimbursable therapy services under Medicare. (*Id.* at ¶ 99)

[6] Prior to her employment with Defendant, Plaintiff worked for approximately forty years in the healthcare industry. (*Id.*) Her prior employment includes serving as Director of Clinical Services, Director of Nursing, Regional Director of Clinical Operations, and Vice President of Patient Care Services for various other skilled nursing facilities. (*Id.*) As a result of her employment experience, Plaintiff alleges that she is "intimately familiar" with "the standards of medical care relating to the provision of therapy to patients in nursing homes" and "the standard of care applicable to nurse staffing." (*Id.* at ¶¶ 64–65, 79)

[7] Although Plaintiff was only employed at the Saybrook facility for four months in 2018, she alleges FCA violations going back seven years before her employment insofar as "some former colleagues" stated that this process had been in existence "for years." (*Id.* at ¶¶ 10, 57) And although Plaintiff only worked at the Saybrook facility she alleges FCA violations at all twenty-three facilities managed by the Defendant in so far as Defendant established corporate-wide policies that universally regulated its staffing, treatment, and billing operations. (*Id.* at ¶¶ 56, 61, 85)

[8] Plaintiff alleges that the Saybrook facility's Director of Therapy, Tara DiChiaro, expressly directed Plaintiff to treat all Medicare patients at the same intensity and frequency without consideration of the patients' medical condition. (*Id.*

physical, occupational, and speech-related services across all twenty-three of Defendant's skilled nursing facilities established two tracks for patient care: one for Medicare patients and one for all other patients. (*Id*. at ¶ 57) Upon admission, these therapists recommended the most intensive therapy and the highest frequency of treatment for Medicare patients, enabling Defendant to bill Medicare at the highest reimbursement rates available. (*Id*. at ¶¶ 2, 59, 69) Specifically, therapists systematically recommended therapy plans that qualified for a Medicare reimbursement rate within a Resource Utilization Group ("RUG") for Ultra-high ("RU") or Very-high ("RV") intensity rehabilitation services,[9] without regard for the Medicare patients' health or medical needs. (*Id*. at ¶ 69) Non-Medicare patients, such as patients with private insurance or Medicaid, generally received less intensive therapy. (*Id*. at ¶ 60)

To demonstrate the excessive nature of the therapy Defendant consistently recommended to its Medicare patients, Plaintiff alleges that Defendant's Medicare patients frequently experienced worsening health conditions and, at times, subsequent hospitalization as a result of

---

at ¶ 86) Patient records indicating the prescribed type and duration of therapy were accessible to DiChiaro, the Saybrook facility's Director of MDS, Caroline Rabano, the Corporate Director of Therapy, Lynne Sarro, and the Corporate Director of MDS, Robin Sweeny. (*Id*. at ¶ 84) Plaintiff further alleges that Medicare patients would often be discharged on Mondays even if their therapy services concluded the previous Friday, in order to bill for "grace days" that are included within the window for the Medicare Assessments Schedule. (*Id*. at ¶ 95) Grace days are intended to give skilled nursing facilities the flexibility to delay care until patients are ready to receive therapy, while ensuring that payments reflect the treatment levels that are provided to the patient. (*Id*.) Defendant's corporate practice was to use grace days to assign Medicare patients more days of therapy, which would result in increased Medicare reimbursement payments. (*Id*.)

[9] The Centers for Medicare and Medicaid Services (CMS) listed five distinct RUG levels that were intended to reflect the anticipated costs associated with providing nursing and rehabilitative services to Medicare beneficiaries based upon their particular characteristics and medical needs: Rehab-Ultra High ("RU"); Very High ("RV"); High ("RH"); Medium ("RM"); and Low ("RL"). (*Id*. at ¶ 36) As relevant to Plaintiff's claims, RU services required at least 720 minutes of therapy per week, combined from at least two therapy disciplines, and one therapy discipline must have been provided at least five days per week. (*Id*.) The daily reimbursement rate for RU services ranged from $497.94 to $595.51. (*Id*.) RV services required between 500 and 719 minutes of therapy per week, and one therapy discipline must have been provided at least five days per week. (*Id*.) The daily reimbursement rate for RV services ranged from $440.69 to $510.87. (*Id*.) The remaining RUG levels required incrementally less intensive and less frequent therapy services and the associated daily reimbursement rates ranged from $445.16 for RH services to $244.99 for RL services. (*Id*.) These daily reimbursement rates reflected the anticipated costs associated with providing skilled therapy services in urban settings and account for a range dependent on the patients' activities of daily living. (*Id*.) Plaintiff estimates that, across all of Defendant's twenty-three skilled nursing rehabilitation facilities, Defendant billed for therapy at one of the five RUG levels on approximately 44,490 days to 47,714 days each year. (*Id*. at ¶ 103)

their treatment at the Saybrook facility. (*Id.* at ¶ 4) Moreover, even when a Medicare patient's health was in obvious decline due to the intensity and frequency of their treatment, Defendant would not adjust their prescribed therapy. (*Id.* at ¶ 75) Based on the symptoms and medical needs of Medicare patients treated at the Saybrook facility, Plaintiff alleges that Defendant systematically subjected its Medicare patients to unreasonable and unnecessary therapy in a manner that violated accepted standard of medical practice and regulatory requirements for Medicare reimbursement.[10] (*Id.* at ¶ 65)

To no avail, Plaintiff raised concerns about Defendant's treatment of its Medicare patients. (*Id.* at ¶ 72) Plaintiff spoke with "numerous nursing supervisors, nurses, and employees" at the Saybrook facility who also expressed concern about the duration, frequency, and intensity of the therapy prescribed to Medicare patients, particularly with respect to patients who were admitted with noticeably compromised health.[11] (*Id.* at ¶¶ 72, 77) Plaintiff opines that the vulnerable condition of these Medicare patients either should have precluded their qualification for skilled rehabilitation therapy services altogether, or should have required materially less intensive therapy. (*Id.*) As a result of Defendant's corporate-wide billing practices, Plaintiff estimates that Defendant overbilled Medicare between $33,196,768 and $132,787,073 from 2011 through 2018.[12] (*Id.* at ¶ 106)

---

[10] Plaintiff identifies and details the treatment of several patients at the Saybrook facility as examples of Medicare patients whose prescribed therapy was medically unnecessary or excessive. (*Id.* at ¶¶ 76, 82)

[11] The Saybrook facilities' Director of Therapy, DiChiaro, told Plaintiff that she was required to treat patients who were terminally ill and qualified for Hospice care, notwithstanding that DiChiaro felt "very uncomfortable" doing so because the patients were too sick to justify the treatment. (*Id.* at ¶ 78) A speech therapist, Elizabeth Rovengo, told Plaintiff that therapists were to "find a way" to bill for skilled therapy services even when the patients were too incapacitated to participate. (*Id.*)

[12] Plaintiff arrived at this estimation as follows: Defendant had twenty-three operating facilities each year, and one to four Medicare patients per facility were receiving unnecessary and unreasonable RU therapy per day at a daily reimbursement rate of $497.94. (*Id.* at ¶ 104) According to Plaintiff, these estimates result in 365 to 1,460 days of false billing per year. (*Id.* at ¶ 105)

In Count Two of her Amended Complaint, Plaintiff further claims that Defendant made false and material statements in connection with its fraudulent Medicare claims. (*Id*. at ¶¶ 115–16) Acting pursuant to the Medicare statute, the Department of Health and Human Services has promulgated regulations governing reimbursement for medical services provided to Medicare beneficiaries. (*Id*. at ¶ 18) In order to be reimbursed by Medicare for services provided to its beneficiaries, skilled nursing facilities and medical service providers must certify that they have complied with applicable requirements in the regulations."[13] (*Id*. at ¶ 20) In support of her claim, Plaintiff references the regulation that Medicare only reimburse services that are reasonable, medically necessary, and utilized for diagnostic and therapeutic purposes. 42 U.S.C. § 1395y(a)(1); (*id*. at ¶¶ 21–22, 100). Notwithstanding this prerequisite for Medicare reimbursement, Plaintiff alleges that therapists specializing in physical, occupational and speech-related services across all twenty-three of Defendant's skilled nursing facilities were complicit in Defendant's billing practice and systematically recommended rehabilitation therapy services that vastly exceeded Medicare patients' medical needs. (*Id*. at ¶¶ 2, 59, 69) Moreover, Plaintiff alleges that the Saybrook facility's Medical Director and chief physician, Glendo L. Tangarorang, M.D., would "rubber-

---

[13] *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 63–64 (D. Conn. 2006). The form that a skilled nursing rehabilitation facility must submit to Medicare in order to be entitled to reimbursement includes the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . ., and on the provider's compliance with all applicable conditions of participation in Medicare." CMS Form 855A; (*id*. at ¶ 18). The form that a medical service providers must submit to Medicare in order to be entitled to reimbursement includes the following certification: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision." CMS Form 1500.

stamp" therapists' recommendations for RU or RV intensity therapy without meaningful review[14] and, at times, after therapy had already begun.[15] (*Id*. at ¶¶ 69–70, 72)

Defendant's Corporate Director of MDS, Sweeny, was responsible for monitoring the Program for Evaluating Payment Patterns Electronic Report ("PEPPER")[16] to ensure that Defendant was not audited for being above state or national averages in the five RUG levels. (*Id*. at ¶ 87) Plaintiff alleges that Sweeny would manipulate data inputs such that the PEPPER system, even if audited, would not indicate any questionable billing practices by Defendant. (*Id*. at ¶ 88) During a corporate-wide meeting on either May 10, 2018 or June 12, 2018, Sweeny educated Defendant's employees to "[f]ly under the radar of the PEPPER" and avoid the risk of being audited by CMS.[17] (*Id*.) Additionally, Plaintiff alleges that each of Defendant's facilities held weekly "Medicare meetings" wherein the facilities' Director of Therapy, Director of Nursing, Business Manager, and Administrator would, *inter alia*, review the nature and overall minutes of therapy provided to Medicare patients, and coordinate the information to be included on forms that Defendant would then submit in conjunction with claims for reimbursement. (*Id*. at ¶¶ 90–92) Defendant used the Triple Check system[18] to tailor records pertaining to any seemingly

---

[14] Plaintiff alleges that Dr. Tangarorang was heavily overworked and unable to dedicate sufficient time to review recommended therapy plans. (*Id*. at ¶ 73) According to the Saybrook facilities' former-Administrator, Pat Hamill, Dr. Tangarorang was only at the Saybrook facility approximately four hours per week while the Saybrook facility admitted new patients twenty-four hours a day, seven days a week. (*Id*. at ¶ 72) Hamill further informed Plaintiff to "just put the [therapy plans] in from of [Dr. Tangarorang] and he will sign [them]." (*Id*. at ¶ 70)

[15] Corporate Director of Minimum Data Sets, Robin Sweeny, complained that Dr. Tangarorang was not signing his orders in a timely fashion. (*Id*. at ¶ 72) Plaintiff alleges that Dr. Tangarorang backdated the orders to appear as if they were timely signed. (*Id*. at ¶ 73) For example, Plaintiff references two Medicare patients whose therapy orders were signed after they were discharged from the Saybrook facility. (*Id*. at ¶¶ 73(a)–(b)) Notwithstanding, Plaintiff alleges that Defendant billed Medicare for therapy services provided to these patients during the full term of their admission. (*Id*.)

[16] PEPPER is a data analysis system managed by CMS that creates a report with provider-specific Medicare data for discharges and services that are vulnerable to improper payments. (*Id*. at ¶ 87) PEPPER cannot be used to identify the presence of payment errors, but it can be used as a guide for providers to monitor claims and proactively prevent payment errors. (*Id*.)

[17] Sweeny explained that CMS set a threshold of five percent over the expected number of claims for RU, RV, and RH therapy, at which point a company would be subject to an audit. (*Id*. at ¶ 89)

[18] Triple Check is a CMS-approved system that is designed to ensure that all claims are correct prior to being submitted to the Government for reimbursement. (*Id*. at ¶ 90)

unreasonable or unnecessary therapy provided to Medicare patients to appear in accordance with CMS standards, thereby increasing the likelihood that Medicare would pay their claims. (*Id*. at ¶ 90)

**Legal Standard**

### A. Rule 12(b)(6):

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), the "complaint must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 556). At this stage "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Id*. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Twombly*, 550 U.S. at 555–56. On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor." *Kinsey v. New York Times Co*., 991 F.3d 171, 174 (2d Cir. 2021) (quotation marks, alterations, and citation omitted). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Ashcroft*, 556 U.S. at 678.

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint. . . ." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp*., 602 F.3d 57, 64 (2d Cir. 2010). However, the Court also "may consider documents attached to the complaint or incorporated into [it] by reference." *Salerno v. City of Niagara Falls*, No. 20-3749-CV, 2021 WL 4592138, at *1 (2d Cir. 2021) (internal quotation marks omitted); s*ee Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("[F]or purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.").

**The FCA and Rule 9(b):**

"The FCA is a statutory scheme designed to discourage fraud against the federal government." *United States ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc*., 377 F.3d 145, 146 (2d Cir. 2004). As relevant to Plaintiff's *qui tam* claims, "the FCA imposes liability on any person who 'knowingly presents . . . a false or fraudulent claim for payment or approval' or who 'knowingly makes . . . a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc*., 865 F.3d 71, 81 (2d Cir. 2017) (citing §§ 3729(a)(1)(A) and (B)). To state a claim under §§ 3729(a)(1)(A) and (B), "[the plaintiff] must therefore allege that (1) defendant submitted a claim[19] for payment to the [G]overnment, (2) the claim for payment was false or misleading,[20] (3) defendant acted

---

[19] The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States" § 3729(b)(2)(A). "A 'claim' . . . includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016).

[20] "Congress did not define what makes a claim 'false' or 'fraudulent.'" *Escobar*, 579 U.S. at 187. The Supreme Court clarified that "[b]y punishing defendants who submit 'false or fraudulent claims,' the [FCA] encompasses claims that make fraudulent misrepresentations, which include certain misleading omissions. When . . . a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements,

knowingly[21] in making that false or misleading claim for payment, and (4) the false or misleading statement was material[22] to the [G]overnment's decision to pay." *United States ex rel. Bonzani v. United Techs. Corp.*, No. 3:16-CV-1730 (JCH), 2019 WL 5394577, at *2 (D. Conn. Oct. 22, 2019) (citing *Chorches*, 865 F.3d at 81).

A complaint pursuant to the FCA is additionally subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), which provides that "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud." *See Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995), *cert. denied*, 517 U.S. 1213 (1996). "To satisfy Rule 9(b)'s particularity standard, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 247 (2d Cir. 2019) (internal quotation marks omitted). "[C]ourts have characterized this pleading standard as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Monda v. Sikorsky Aircraft Corp.*, No. 3:99CV1026 (JBA), 2005 WL 1925903, at *2 (D. Conn. Aug. 11, 2005), *aff'd*, 207 F. App'x 28 (2d Cir. 2006). The Second Circuit Court of Appeals has "rigorously enforced Rule 9(b), recognizing that the rule has a number of salutary purposes, including (1) provid[ing] a defendant with fair notice of a plaintiff's claim, (2)

---

those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the . . . services provided." *Id.* at 186–87.

[21] The FCA defines "knowing" and "knowingly" as (1) possessing "actual knowledge of the information," (2) acting "in deliberate ignorance of the truth or falsity of the information," or (3) acting "in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A). The FCA "require[s] no proof of specific intent to defraud." § 3729(b)(1)(B). And although "Rule 9(b) permits scienter to be averred generally, . . . [the Second Circuit has] repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020). *See also Escobar*, 579 U.S. at 192 (observing that FCA's scienter requirement is "rigorous").

[22] The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4).

safeguard[ing] a defendant's reputation from improvident charges of wrongdoing, and (3) protect[ing] a defendant against the institution of a strike suit." *Gelbman*, 790 F. App'x at 247–48 (internal quotation marks omitted). Dismissal for failure to satisfy Rule 9(b)'s particularity standard is required where FCA claims under §§ 3729(a)(l)(A) and (B) rest on "speculation and conclusory allegations." *Id*. at 249.

**Discussion**

The Amended Complaint describes a decade-long fraudulent scheme to prescribe medically unnecessary therapies to vulnerable patients for the purpose of maximizing Medicare billing and reimbursements. Many of the allegations are conclusory in nature and/or premised upon assumptions, speculation, or both. And a careful review of Plaintiff's Amended Complaint reveals a fatal deficiency to all of Plaintiff's claims: Plaintiff has not alleged that Defendant presented a false claim to the Government for reimbursement with the particularity required under the FCA and Rule 9(b).

"The submission of a false claim is . . . the *sine qua non* of a [FCA] violation." *U.S. ex rel. Clausen v. Lab'y Corp. of Am*., 290 F.3d 1301, 1311 (11th Cir. 2002); *United States v. Wal-Mart Stores E., LP*, 858 F. App'x 876, 878 (6th Cir. 2021), *cert. denied sub nom*., *Sheoran v. Walmart Stores E., LP*, 142 S. Ct. 1210 (2022); *see U.S. ex rel. Kester v. Novartis Pharms. Corp*., 23 F. Supp. 3d 242, 253 (S.D.N.Y. 2014) ("[T]he submission of a 'claim' is an essential element of causes of action under [§§ 3729](a)(1)(A) and (a)(1)(B)."). The primary component of an FCA violation is that "the defendant must submit or cause the submission of a claim for payment to the [G]overnment." *Chorches*, 865 F.3d at 83. Rule 9(b)'s particularity requirements do "not permit a [FCA relator] merely to describe a private scheme in detail but then to allege simply and without any stated reason for [her] belief that claims requesting illegal payments must have been submitted,

were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311; *Ameti ex rel. United States v. Sikorsky Aircraft Corp.*, No. 3:14-CV-1223 (VLB), 2017 WL 2636037, at *6 (D. Conn. June 19, 2017). "The mere existence of a fraudulent scheme is insufficient for FCA liability; rather, [a] defendant has violated the FCA only when [it] has presented to the [G]overnment a false or fraudulent claim for payment." *Monda*, 2005 WL 1925903, at *3. *See Clausen*, 290 F.3d at 1311 ("Without the *presentment* of . . . a [false] claim . . . there is simply no actionable damage to the 'public fisc' as required under the [FCA].") (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 785 (4th Cir. 1999)). To state a plausible claim for relief under the FCA, a relator must therefore plead that "false records were actually presented to the [G]overnment for reimbursement." *Chorches*, 865 F.3d at 84.

In *United States ex rel. Ladas v. Exelis, Inc.*, the Second Circuit affirmed the dismissal of a relator's complaint alleging FCA violations for failing to plead fraud with particularity under Rule 9(b) because it did "not include the specifics of any claims submitted . . . to the [G]overnment." 824 F.3d 16, 27 (2d Cir. 2016). Similarly, the court in *United States ex rel. Scharff v. Camelot Counseling* dismissed a *qui tam* complaint for failing to meet the heightened pleading requirements of Rule 9(b) because the relator made no allegations pertaining to any submission of a false claim. No. 13-CV-3791 (PKC), 2016 WL 5416494, at *8 (S.D.N.Y. Sept. 28, 2016). Critically, the court found that the complaint did "not attach a sample of any false claim or describe the contents or format of [defendant's] reimbursement claims." *Id. See also Ameti*, 2017 WL 2636037, at *7 (citing "cases in [the Second C]ircuit dismissing and upholding dismissal of cases in which the [relator] failed to plead with specificity that a false claim was actually made").

Here, Plaintiff's Amended Complaint suffers the same fundamental deficiency as it does not identify any specific claims for Medicare reimbursement—to include the date of any such

claim, the content of the forms or bills submitted, identification numbers, the amount billed to the Government, the particular services for which the Government was billed, the patients or individuals involved in the billing, or the length of time between the alleged non-reimbursable treatment of Medicare patients and the submission of claims for their care. This information, or at least some of it, is critical to stating a FCA violation with the requisite particularity under Rule 9(b). *Monda*, 2005 WL 1925903, at *3; *see also Chorches*, 865 F.3d at 89–90, 90 n.16 (recognizing circuit court cases that generally require relator to allege "details identifying actual false claims submitted to the [G]overnment"). "Although there is no 'mandatory checklist' requiring [a relator] to plead specific information, [Plaintiff] provides *zero* details identifying particular false claims and instead concludes fraudulent bills must have been submitted. . . . Plaintiff [merely] alleges a course of conduct or scheme which [s]he assumes culminated with the submission of claims." *Ameti*, 2017 WL 2636037, at *6 (emphasis in original). Although Plaintiff describes a far-reaching conspiracy to over-prescribe therapies and to over-bill Medicare, there simply are no factual allegations that any bills were actually submitted to the Government. These allegations are plainly insufficient under Rule 9(b). *See Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc.*, 328 F. App'x 744, 750 (2d Cir. 2009) (summary order) (affirming dismissal of *qui tam* complaint that did "not cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment . . . at a specific time").

Plaintiff all but acknowledges this deficiency but nonetheless asserts that the Amended Complaint should not be dismissed and that the particularity requirement should be relaxed under the circumstances presented here. "[T]he Second Circuit has stated that Rule 9(b) may be 'relaxed' where key facts are 'are peculiarly within the opposing party's knowledge,' and the plaintiff has no access to those facts." *Kester*, 2014 WL 2619014, at *6 (citing cases). In those circumstances,

"relaxation" of the pleading standard meant that the plaintiff could plead on information and belief, which is usually prohibited under Rule 9(b). *Id.* Relaxation does not mean that a plaintiff can plead no detail at all. *Id.* The Second Circuit has stated: "This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

The genesis of this exception lies in *Chorches*—a Second Circuit case in which the plaintiff was permitted to plead false billing "on information and belief." As both parties cite *Chorches* as supporting their respective positions, it is examined in detail.[23]

In *Chorches*, the Second Circuit reversed the dismissal of a *qui tam* complaint that alleged "on information and belief" that false claims were submitted to Medicare for reimbursement. 865 F.3d at 81, 86. In that complaint, the relator conceded that he could not "identify exact billing numbers, dates, or amounts" for claims submitted to the Government. The Court held, on the facts of the case, that a *qui tam* complaint that does not "allege on personal knowledge specific identified false invoices submitted to the [G]overnment" may nevertheless "satisfy Rule 9(b)'s particularity requirement by making *plausible allegations creating a strong inference* that specific false claims were submitted to the [G]overnment and that the information that would permit further identification of those claims is *peculiarly within the opposing party's knowledge*." *Id.* at 86 (emphasis added). Thus, the Second Circuit has set forth a dual inquiry when assessing the sufficiency of a *qui tam* complaint that alleges only "on information and belief" that false claims were submitted to the Government. A plaintiff must first put forth plausible allegations that create

---

[23] During oral argument, Plaintiff conceded that she has no personal knowledge that Defendant actually presented false claims to the Government for reimbursement, and accordingly relies on the Second Circuit's analysis in *Chorches*.

a "strong inference" that false claims were submitted, *and* must demonstrate that identification as to specific claims is "peculiarly within the opposing party's knowledge."[24] *Id.*

A review of the allegations in *Chorches* is instructive as to when these inquiries are satisfied in favor of permitting a FCA claim to go forward on information and belief. Plaintiff-relator Paul Fabula[25] was an EMT who worked for the defendant ambulance company, AMR, for a period of approximately sixteen months. *Id*. at 75. "As an EMT, Fabula provided emergency and non-emergency medical transport services, some of which were reimbursable under Medicare and/or Medicaid." *Id*. The complaint alleged that AMR engaged in a fraudulent scheme to obtain money from Medicare by falsely certifying that the ambulance transports were medically necessary and therefore reimbursable under the Medicare rules and regulations. *Id*. "Medically necessary" as it relates to ambulance transport requires that a patient's condition be such that "use of any other method of transportation is contraindicated (*i.e*. inadvisable for the patient's health). *Id*. at 76. As a result, AMR was required to submit information regarding a patient's condition so as to justify the claim that the transportation was medically necessary. *Id*. In this vein, EMTs were required to complete an electronic Patient Care Report ("PCR"), which contained significant detail regarding the patient and the service provided. *Id*. The description of the patient's condition determined whether a transport was medically necessary. *Id*.

The complaint then alleged that during Fabula's employment, AMR "routinely made its EMTs and paramedics revise or recreate their PCRs to include false statements purportedly demonstrating medical necessity, thus rendering the services reimbursable under Medicare. *Id*.

---

[24] The Second Circuit found its holding to be consistent with traditional interpretation Rule 9(b) as applied to FCA complaints. *See id.* at 92 ("[W]e do not view our interpretation of Rule 9(b) to be in conflict with that of our sister Circuits."). The Second Circuit cautioned that it was not "adopting a 'lenient' pleading standard" and that its holding "must not be mistaken for a license to base claims of fraud on speculation and conclusory allegations." *Id*. at 86, 92.

[25] Fabula brought the *qui tam* action. However, as the events in question pre-dated Fabula's bankruptcy, the Court determined that the claim belonged to his bankruptcy estate. Ronald Chorches was the trustee for Fabula's bankruptcy estate and therefore intervened in order to pursue the claim.

Specifically, AMR supervisors would provide the EMTs with printouts of their original PCRs "marked up with handwritten revisions that altered the substance of the original PCRs so as to falsely characterize the [ambulance] runs as medically necessary." *Id*. The AMR supervisors instructed the EMTs on how to modify the PCRs and admitted to Fabula that the purpose of the revisions was to qualify the ambulance run for Medicare reimbursement. *Id*. After the revisions were made by the EMTs, the supervisors collected and shredded the printouts with the handwritten changes. *Id*. The altered PCRs remained in the AMR database for billing purposes. *Id*.

In addition to identifying several categories of patients that were routinely falsely documented as receiving medically necessary medical transport, the complaint detailed ten specific instances where Fabula was directed to falsify his PCR. *Id*. at 76–77. One involved a woman with a chronic allergy issue, who called for an ambulance because she thought she would not have to wait at the hospital if she arrived by ambulance. *Id*. at 77. Another wanted to avoid paying for his cough medicine. *Id*. One call was for transportation to a medical appointment that was cancelled mid-run because it was the wrong date. *Id*. Notwithstanding, Fabula was instructed to complete the PCR to reflect not only transport to the appointment but the return trip as well. *Id*. Yet another patient "had no medical reason to be sent to the hospital, he simply wanted to go there." *Id*. Finally, the complaint detailed one patient who called for an ambulance six-dozen times in 2011 to bring him to a medical facility to obtain insulin. *Id*. For this patient, Fabula was instructed to include in the PCR that the patient had difficulty remaining in an upright position. *Id*.

From these detailed allegations which were based upon Fabula's personal knowledge the Second Circuit determined that the complaint created a strong inference that false claims were submitted to the Government for reimbursement. *Id.* at 84–85.

As to the second inquiry, Fabula alleged "facts establishing specific reasons why such information regarding the particular bills that were submitted for reimbursement [was] peculiarly within [the defendant's] knowledge." *Id*. at 82. Specifically, the complaint alleged that all ambulance personnel were precluded from entering the defendant's administrative building where billing and records were kept, were only permitted in the garage and at the "window" when they punched in and punched out each workday, never participated in billing procedures (other than to falsely certify the PCRs), and otherwise did not have access to information about defendant's submissions to Medicare. *Id*. at 82–85. Thus, where the complaint provided detailed factual allegations which created a strong inference that false claims to Medicare had been submitted, and the relator had no ability to access or learn the specifics of any particular claim because the information regarding same was in the hands of the defendant, the Second Circuit determined that the requirements of Rule 9(b) are satisfied. *Id*. at 93.

Here, Defendant argues that the Amended Complaint satisfies neither criteria set forth in *Chorches*. The Court agrees.

First, Plaintiff's Amended Complaint does not plausibly allege facts creating a strong inference that the purported fraudulent scheme resulted in false claims being submitted to the Government. Indeed, Plaintiff's non-conclusory allegations do not meet the threshold of establishing with particularity the existence of a fraudulent scheme in the first instance. *See id.* at 83 (analyzing whether complaint alleges with sufficient particularity under Rule 9(b) the existence of "a scheme of fraud" before considering whether allegations support strong inference that false claims were submitted). Plaintiff's Complaint broadly alleges that Defendant presented false claims every time it requested reimbursement for RU or RV therapy services provided to its

Medicare patients at all twenty-three of its facilities from 2011 to present.[26] Plaintiff's conclusory allegations that the fraudulent practices occurred at all twenty-three facilities because they had overlapping management teams is implausible under either Rule 9(b) or Rule 12(b)(6) as it relies upon pure speculation. Plaintiff has alleged no personal knowledge as to the operation of any facility other than the Saybrook facility. The extent of allegations supporting Plaintiff's claim that Defendant violated the FCA as far back as 2011 is that "some former colleagues" stated that Defendant's alleged practice had been in existence "for years." The selection of 2011 is both conclusory and frankly, arbitrary. And the only allegations supporting her claim that Defendant violated the FCA after her employment terminated on July 20, 2018 is that Plaintiff raised concerns about Defendant's alleged practice "to no avail." She assumes the practice continued into the future. In sum, Plaintiff's allegations of fraud beyond the four months of her employment in 2018 rest on impermissible speculation, conjecture, and conclusory allegations. *See Gelbman*, 790 F. App'x at 249 (dismissal for failure to satisfy Rule 9(b)'s particularity standard is required where FCA claims rest on "speculation and conclusory allegations").

Even providing Plaintiff the benefit of the inference that Defendant's alleged scheme could not rise or fall overnight, the allegations of a fraudulent scheme during the time that she was employed by the Defendant are themselves entirely conclusory and derive from her competing medical opinion as to what therapies were appropriate for the patients. Utterly lacking are the types

---

[26] The parties agree that any alleged scheme could not have continued beyond October 1, 2019. On that date, CMS discontinued the RUG reimbursement rating system which allegedly sustained Defendant's fraudulent billing practices and serves as Plaintiff's identification of Medicare patients who received medically unreasonable or unnecessary treatment. *See* CMS, *Patient Driven Payment Model: Frequently Asked Questions*, § 1.1 (August 27, 2019), https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/SNFPPS/Downloads/PDPM_FAQ_Final _v5.zip. *See also Richardson v. New York City Bd. of Educ.*, 711 F. App'x 11, 13–14 (2d Cir. 2017) ("Courts may take judicial notice 'at any stage of the proceeding.' Fed. R. Evid. 201(d). Under Federal Rule of Evidence 201(b)(2), courts may judicially notice facts that are 'not subject to reasonable dispute because [such facts] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' [Such sources include] . . . public documents, promulgated by or binding on a government agency.").

of detail, based upon personal knowledge, that were present in *Chorches.* Indeed, although Plaintiff cites to specific patients who, in her opinion, were prescribed more intense therapy than their conditions warranted, the reasons she offers—higher billing to Medicare—is without foundation in any factual allegations. Plaintiff does not allege that any individual acknowledged or even hinted at a connection between the therapy prescribed and the ability to maximize Medicare billing. And although Plaintiff alleges that she voiced her concerns regarding the level of therapies prescribed, there are no allegations that she challenged any billing practices that might flow from her difference of opinion. Indeed, Plaintiff concedes that Defendant's billing scheme was "unwritten" and therefore relies on her opinion that the therapy services were inappropriate to support the inference that false billing to Medicare must have been the motive. Finally, Plaintiff's estimate of the monetary range that Defendant allegedly overbilled Medicare is complete conjecture if not spun of whole cloth.

Notwithstanding, even if the allegations, whether for the four-month period of her employment or for some longer period of time, were sufficiently fact-based so as to create a strong inference that false claims were submitted, the Amended Complaint does not plausibly allege that the information regarding the submission of claims for reimbursement to Medicare is peculiarly within the Defendant's knowledge and control so as to forgive the level of particularity ordinarily required. Plaintiff argues that she had no responsibility for the actual billing or invoicing of claims to Medicare. Notwithstanding, Plaintiff was the Director of Nursing at the Saybrook facility. As such, she was able to attend Medicare meetings, wherein she and other directors, managers, and administrators would review the amount and nature of therapy being provided to Medicare patients and coordinate the information to be included on claim forms that Defendant would submit for reimbursement. This is direct access to individual patient records which would then be used to

prepare Medicare reimbursement claims. Second, as the Director of Nursing at the Saybrook facility, Plaintiff managed and supervised the facility's regulatory compliance process. Finally, in her capacity as lead nurse and as exhibited by the submissions attached to her Amended Complaint, Plaintiff had access to patient's medical charts and other clinical records from which Medicare bills would be prepared. Notably, unlike in *Chorches,* there are no allegations that the medical records themselves were falsified to support fraudulent billing. Plaintiff only alleges that the Defendant routinely prescribed intense therapies to Medicare patients even when those therapies were contraindicated by the Plaintiff's condition, at least in her opinion. Indeed, the circumstances of Plaintiff's position as Director of Nursing, her participation in the Medicare meetings and her access to clinical records belies the assertion that, like Fabula in the *Chorches* case, the information necessary to complete the "who what when and where" of an FCA claim lies exclusively, or even particularly, with the Defendant. In sum, the Amended Complaint does not establish the exceptional circumstances contemplated in *Chorches* and the requirements of Rule 9(b) are not satisfied. *See* 865 F.3d at 83 ("[T]hrough no fault or lack of diligence on [his] part, [relator] lacked the ability to identify specific documents containing false claims that [defendant] submitted to the [G]overnment.").

Because Plaintiff does not allege with sufficient particularity, on personal knowledge or on information and belief, that Defendant presented a false claim to the Government for reimbursement, her Amended Complaint fails to state a plausible claim for relief and must be dismissed.[27] *See Gelbman*, 790 F. App'x at 249 (affirming dismissal of FCA complaint that offered

---

[27] Defendant argues that the third count of Plaintiff's Amended Complaint pursuant to § 3729(a)(1)(C) must also be dismissed because: (1) her Amended Complaint fails to sufficiently allege claims pursuant to §§ 3729(a)(1)(A) or (a)(1)(b), or, alternatively, (2) her claim pursuant to § 3729(a)(1)(C) fails to satisfy the particularity requirements under Rule 9(b).

The Court need not determine whether Plaintiff's failure to plead fraud with sufficient particularity to allege a violation of §§ 3729(a)(1)(A) or 3729(a)(1)(B) is fatal to her claim pursuant to § 3729(a)(1)(C) because the Court agrees with Defendant's alternative argument that the Amended Complaint does not allege a § 3729(a)(1)(C) violation with

no detail as to why relator lacked personal knowledge of the contents of false claims submitted

Government). Further, on May 27, 2021, Defendant moved to dismiss Plaintiff's original

complaint on the grounds that the factual allegations were completely wanting. (ECF No. 25)

Defendant sought dismissal with prejudice in light of the identified deficiencies. (*Id.*) In response,

Plaintiff filed the operative Amended Complaint, presumably in an effort to address the alleged

inadequacies. (ECF No. 32) As discussed above, the Amended Complaint fails to plausibly allege

FCA violations. Given the dearth of factual, as opposed to conclusory, allegations in support of

these claims, Plaintiff's acknowledgement that she lacks personal knowledge of any specific false

claims submitted to Medicare, and because Plaintiff has already attempted to adequately and

plausibly allege FCA violations, the Amended Complaint is dismissed with prejudice. *See Santos*

*v. Eye Physicians & Surgeons*, P.C., No. 3:18-CV-1515 (VAB), 2019 WL 3282950, at *11 (D.

Conn. July 22, 2019) ("While [relator] has not yet moved for leave to amend [her flawed FCA]

---

particularity in accordance with Rule 9(b). Defendant's correctly note that Plaintiff's claim pursuant to § 3729(a)(1)(C) improperly rests on speculation and conclusory allegations. Specifically, Plaintiff relies almost exclusively on the corporate structure and the respective ownership of the various alleged co-conspirator entities to support her conspiracy claim. This is inadequate. *See United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063 (EBB), 2000 WL 1336487, at *11 (D. Conn. Aug. 24, 2000) ("[G]eneral allegations of conspiracy do not meet the particularity standard required" by Rule 9(b).). *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 JG VVP, 2011 WL 7053807, at *15 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, No. 08-CV-00042 JG VVP, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) ("The argument that the grouped defendants joined the alleged conspiracies through their corporate affiliation is precisely the sort of 'legal conclusion couched as a factual allegation' that *Twombly* and *Iqbal* deemed insufficient to state a claim."); *see Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1129 (Fed. Cir. 2021) (finding plaintiff's allegations that defendant "directs and controls" alleged co-conspirator based on its corporate structure to be conclusory and insufficient to state a claim); *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent. . . . Nor will liability be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary.") (citations omitted); *see also Town of Mamakating, N.Y. v. Lamm*, No. 15-CV-2865 KBF, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015), *aff'd sub nom.*, *Town of Mamakating, New York v. Lamm*, 651 F. App'x 51 (2d Cir. 2016) ("The fatal flaw is plaintiffs' failure to explain the specific details of any hierarchy, organization, or unity among the various alleged conspirators in any non-conclusory way.") (internal quotation marks omitted). And critically, Plaintiff's Amended Complaint does not contain any allegations of an agreement between Defendant and the other alleged co-conspirator entities to violate the FCA. *See Ameti*, 2017 WL 2636037, at *9 (D. Conn. June 19, 2017) (dismissing claim pursuant to § 3729(a)(1)(C) for failing to "identify a specific statement where [the co-conspirators] agreed to defraud the [G]overnment" as required by Rule 9(b)); *Ladas*, 824 F.3d at 27 (same); *Scharff*, 2016 WL 5416494, at *9 (same). During oral argument, Plaintiff did not meaningfully dispute Defendant's contention in this regard. Accordingly, the third count of Plaintiff's Amended Complaint pursuant to § 3729(a)(1)(C) must be dismissed.

[c]omplaint, . . . granting such leave to amend . . . would be futile."); *see, e.g., Ladas*, 824 F.3d at 28–29 (affirming dismissal with prejudice and denial of leave to amend where relator "was fully aware of the Rule 9(b) challenges to his pleading," yet his second amended complaint "failed to cure the . . . deficiencies"); *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 88 (2d Cir. 2017) (affirming denial of leave to amend and dismissal with prejudice where there "is no excuse for a repeated failure to plead a plausible FCA claim with particularity"); *Chapman v. Off. of Child. & Fam. Servs. of the State of New York*, 423 F. App'x 104, 105 (2d Cir. 2011) (affirming dismissal with prejudice where "[t]he present record indicates that under the theories presented in [the] complaint, [relator] will never be able to plausibly allege that [d]efendants committed fraud").

**Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Clerk of the Court is directed to close the file.

**SO ORDERED** at Bridgeport, Connecticut, this 10th day of August 2022.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE